Filed 7/9/14  In re K.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.C. et al., Persons Coming Under the Juvenile Court Law. | B250897 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>W.C.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK78135) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Akemi Arakaki, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

————

W.C. (father) appeals from the juvenile court's judgment of June 26, 2013, declaring his sons, K.C. and R.C., dependents of the court under Welfare and Institutions Code section 360.[1]  He contends substantial evidence does not support the sustained allegations under section 300, subdivisions (a), (b), and (j) that there is a substantial risk the children will suffer serious physical harm inflicted non-accidentally or serious physical harm or illness as a result of his failure to adequately supervise.  We affirm.

**STATEMENT OF FACTS AND PROCEDURE**

K. was born in 2001 and R. was born in 2002 to father[2] and R.M. (mother), who were married.  Parents were divorced in 2008.

The family had an extensive history with Department of Children and Family Services (Department).  There were 20 child abuse or neglect referrals spanning 12 years.  The family had a voluntary family maintenance case under Department supervision in 2004-2005 due to father's emotional abuse of the children.  In 2008, father cracked mother's head against a window.  K. was injured when he stepped on a piece of the broken glass.  In 2009, the children were made dependents of the court and placed in home of parent-mother under a plan of family maintenance due to, among other things, father's striking them with a sandal, derogatory name-calling, and domestic violence, which caused the children to suffer post traumatic stress disorder[3] and placed them at risk of physical harm inflicted non-accidentally and emotional harm.  As father did not complete required services and the children were afraid of unmonitored visits, mother was granted full custody of the children when

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]     The court found father to be the children's presumed father.

[3]     In addition, K. received a diagnosis of mild autism and R. demonstrated behaviors associated with the inattention subtype of attention deficit hyperactivity disorder.  The children began attending weekly psychotherapy in 2006.

the court terminated jurisdiction in 2010 with a family law order. Father's visits were required to be monitored.

In 2011, as a result of his concerns about father, K. made a plan to commit suicide by hanging himself by a book bag strap from the monkey bars at school.

In 2012, after father filed an order to show cause in family court to modify visitation and child support, parents agreed to gradually lift father's visitation restrictions.

Beginning in January 2013, parents shared custody equally, each parent having the children on alternating weeks. The children's therapist reported, " 'conflicts between the boys and their father appeared to escalate dramatically. . . . [T]he boys were experiencing a great deal of stress, anxiety, and anger.' " Father regularly pushed K., was mean to the children for no reason, constantly called them derogatory names such as "asshole" and "sons of bitches," told them that what they say is "bullshit," yelled at the children constantly, and did not feed them enough.

On two occasions, father left the children in his car unattended for hours while he attended a cockfight. On one of the occasions, he left them alone in the car in a garage for four hours. The children were frightened and hungry, but they were afraid to get out of the car because father had told them the car alarm was set to go off if they left the car. On one occasion, K. saw the cocks fighting. One of the men at the cockfight warned K. to keep his mouth shut.

Father did not believe the children should be in therapy, told the children therapy does not work and they did not need it, and did not take them to their weekly therapy appointments. Father did not believe the children suffered from post-traumatic stress syndrome or that K. was autistic. He attributed the diagnosis of post-traumatic stress syndrome to the fact that the children moved often when in mother's care. Father did not take K. to K.'s program for children with autism.

The children were afraid of father, felt unsafe in his home, and wanted nothing to do with him. K. reported in early March 2013 he would run away if father called him names any more. Each child ran away from father's home. On one occasion, R. took the subway to mother's home.

On March 9, a rainy day, when R. did not return to father's apartment after school, K. became very worried and felt he should go out and search for R. K. believed the responsibility for safeguarding R. rested on his shoulders because father refused to answer when he asked where R. was, and, on a previous occasion, father stated he did not care if R. ran away. Blocked by father from getting in the elevator, K. attempted to take the stairs. Father grabbed K. with such force that K.'s sweater and shirt were ripped from his body. Father shoved K. to the ground and dragged him across the floor, scratching K.'s rib cage, arm, and neck. K. yelled for help. Following this incident, K. told his school counselor he was afraid of father and he would run away if he had to go back to father's care.

The children were intelligent and were good advocates for themselves. Their therapist believed their reports about visits with father. "[T]he children have 'high conflict' with father . . . and the last time [the therapist] saw the children, they were having a difficult time, crying and stating that they wanted to run away from father's home if they had to go back for the next visit."

On March 11, 2013, father played videotapes to the therapist and children which showed father having power struggles with the children. The children were very upset, because they had not known father was taping them. Concerned about the physical and emotional abuse, the therapist concluded it was not in the children's best interest to continue overnight visits.

Another videotape, recorded late at night, depicted the children very upset and angry with father because he would not let them call mother on the telephone. Father stated he made the tape to show the children were not telling the truth about him. "The children appear agitated and are crying as father videotapes them and the children are saying, 'can't you listen to us for once? We want to go to mom's house. What kind of person are you[,] dad? Why are you filming us? I can get the locked gun. Why are you smiling while taping us? If mom were here[,] she would beat the fuck out of you. You beat mom before. What do you fuckin' want to achieve? What do you want from us?' Father again says that he needs to protect himself and R. then states, 'I'll kill you when you fall asleep, you sick bastard.' Father asks R. what he said and R. states, 'Nothing.' Father then says, 'You're going to kill me[,] huh?' "

Father denied he did anything wrong. He stated he did not beat mother, yell at the children, or call the children derogatory names. He stated he never hit or pushed the children or exposed them to cockfights. K. stated that in 2007 and 2008, father threw slippers at the children and hit them with slippers as punishment. Father said the incidents with the slippers were just a game. He said the children were not afraid of him. Father stated that the children's anger did not come from anything he did. He blamed mother and the children for his problems with the children.

In late March 2013, father agreed that the children would remain in mother's home pending an investigation by the Department. Once the children were back with mother fulltime and not having visits with father, they were "calmer [and] less anxious." Father participated in a team decision-making meeting in late April, but he refused to sign the safety plan established at the meeting. Father was referred to therapy that would focus on assisting parents to identify their parental role and developing stronger parent-child relationships, but he resisted participating.

The Department detained the children from father on May 8, 2013, and filed a section 300 petition.

On June 26, 2013, the children were declared dependents of the court based on sustained allegations under section 300, subdivisions (a), (b), and (j). In counts a, b-

1, and j, the court found the children are at serious risk of physical harm in that, in 2013, father physically abused K. by dragging him on the floor, ripping his clothes off and throwing slippers at him, K. feared father and did not want to live in his home, and K. is a prior dependent of the court due to father's physical abuse. In count b-2, the court found the children are at serious risk of physical harm in that the children were diagnosed with post-traumatic stress disorder and father failed to keep the children's scheduled appointments with their therapist.

Custody was taken from father, and the children were ordered to remain in mother's custody. The Department was ordered to provide family maintenance services. Father was to be provided enhanced services. He was ordered to participate in a program of parenting special needs children, individual counseling to address case issues and anger management issues, and conjoint counseling if recommended by the children's therapist and father's therapist. He was granted one hour monitored visits in a therapeutic setting two times per month.

## DISCUSSION

*Substantial evidence.*

1. *Count b-1,*

Father contends the evidence is not sufficient to support the sustained allegations in count b-1, under section 300, subdivision (b).[4] We disagree with the contention.

---

[4] To the extent father contends the sustained allegations are not sufficient to support jurisdiction, the contention was forfeited by his failure to file a demurrer. The legal sufficiency of a petition cannot be challenged for the first time on appeal. (*E.g. In re Christopher C.* (2010) 182 Cal.App.4th 73, 82-83.) To test the legal sufficiency of a petition, a demurrer must be filed in the dependency court pursuant to the procedure set forth in Los Angeles County Superior Court Rules, rule 7.16(d). If a demurrer is not filed, any challenge on appeal to the legal sufficiency of the petition is forfeited. *(E.g., In re Christopher C.,* at p. 83.) In any event, any deficiency of the petition was rendered harmless by the fact that a jurisdictional hearing was held and substantial evidence supports the finding of jurisdiction.

In determining whether a finding or order is supported by substantial evidence, "we look to see if substantial evidence, contradicted or uncontradicted, supports [it]. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

"When considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465.) (Accord, *In re Matthew S.* (1988) 201 Cal.App.3d 315, 321 [we "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court"].) Thus, the pertinent inquiry is whether substantial evidence supports the finding, not whether a contrary finding might have been made. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Section 300, subdivision (b), in pertinent part, describes a child who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) Section 300, subdivision (b) "does not require that a child actually be abused or neglected before the court can assume jurisdiction. [Section 300, subdivision (b)] require[s] only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of [section 300] 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being

7

exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. . . . A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Substantial evidence supports the sustained allegation in count b-1. The record contains evidence father grabbed K. and dragged him across the floor near the stairs in the apartment building, tearing his clothes off and causing injuries. Grabbing and dragging a resisting child near a staircase creates a grave risk the child will be flung down or tumble down the stairs, causing serious physical harm. It is reasonable to infer from the evidence father threw slippers and sandals at the children to punish them that he threw the objects with force, aiming to strike them. Forcefully throwing objects at children with the intent of striking them creates a substantial risk of causing serious physical harm. There was evidence father minimized the abuse, calling it "playing," and refused to participate in rehabilitative treatment. His denial he physically abused the children, resistance to treatment, and recent physical abusiveness, is evidence the abuse is likely to continue and cause the children serious physical harm.

There is evidence father had a contentious relationship with the children, involving frequent anger, derogatory name-calling, and refusals to listen to them. The children suffered from post-traumatic stress syndrome as a result of father's conduct. There is evidence K. was so negatively affected by father's treatment he planned to commit suicide. Angered and frustrated by father's insensitivity and

8

aggression, the children ran away and threatened to continue running away. Running away from parental protection and supervision jeopardizes a child's safety, health, and welfare, causing a substantial risk of serious physical harm or illness. Moreover, father's conduct made K. so fearful and angry he threatened to get father's gun. A gun in the hands of an upset child creates a substantial risk the child and others will be shot. There is evidence father left the children unattended in the car for hours in an unfamiliar location, including, on one occasion, warning them they must not get out of the car, which created a risk the children would not receive protection and assistance should something go wrong. From the evidence father denied his role and took no responsibility for the children's psychiatric diagnosis, negative emotions, and risky behaviors, it may be reasonably inferred that father will continue his inappropriate parenting and failure to protect, which will create an ongoing substantial risk the children will suffer serious physical harm.

The foregoing is substantial evidence supporting juvenile court jurisdiction under section 300, subdivision (b) based on the allegations of count b-1.

Father reargues the evidence and asks us to reweigh it. This we will not do. Our role is to determine whether substantial evidence supports the finding. In this case, ample substantial evidence supports the finding.

2. *The remaining sustained allegations.*

Father contends substantial evidence does not support the findings under section 300, subdivisions (a)[5] and (j)[6] or in count b-2 under section 300, subdivision (b). As we have concluded juvenile court jurisdiction is supported under section 300,

---

[5] Section 300, subdivision (a) describes a child who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

[6] Section 300, subdivision (j) describes a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

9

subdivision (b) as alleged in count b-1, we need not address the contentions that jurisdiction is not supported by additional grounds.

When one jurisdictional finding has been found to be supported by substantial evidence, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings. (See *In re I.J., supra,* 56 Cal.4th at p. 773 [affirming jurisdiction under section 300, subdivision (j) [sibling abuse], the Supreme Court held it did not need to consider whether the evidence supported jurisdiction under subdivisions (b) or (d)].) "As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

Father contends we should exercise discretion and reach the other jurisdictional findings, even though any infirmity in them would not result in a reversal of the juvenile court's assertion of jurisdiction. (Cf. *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493-1494 [where jurisdiction was sustained based on one sustained allegation, appellate court declined to exercise discretion to review the other sustained allegation, as no potential adverse consequence was identified].)

Father does not identify any specific adverse impact that the challenged findings could have on him. As substantial evidence supports the physical abuse allegation and father does not challenge the findings the children have post-traumatic stress syndrome and he failed to take them to their therapy appointments, individual counseling will address these issues even if the evidence for the allegations under section 300, subdivisions (a) and (j) and count b-2 were to be found lacking.

As we find substantial evidence supports jurisdiction under count b-1 and father does not identify any consequence to him from the challenged findings, we will not review whether those findings constitute additional grounds for jurisdiction.

**DISPOSITION**

The judgment and orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.